## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARCIA NAMOWITZ, on behalf of herself and all others similarly situated,<br><br>      Plaintiff(s),<br><br><br>     -against-<br><br>OASIS OUTSOURCING HOLDINGS, INC ; KELLY SERVICES, INC.; and JOHN DOES 1-25,<br><br>      Defendant(s). | Civil Case Number: _____<br><br><br>**CIVIL ACTION**<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, MARCIA NAMOWITZ, on behalf of herself and all others similarly situated (hereinafter "Plaintiff") by and through her undersigned attorney, alleges against the above-named Defendants, OASIS OUTSOURCING HOLDINGS, INC ("Oasis"); KELLY SERVICES, INC. ("KSI"); and JOHN DOES 1-25, their employees, agents, and successors (collectively "Defendants") the following:

### PRELIMINARY STATEMENT

1. Plaintiff brings this action as a class action for damages and declaratory relief arising from Defendants' greediness in wrongfully, unjustly and reprehensively withholding the incorrect amount of monies and/or overcharging Plaintiff, and the putative class, for monetary amounts pursuant to Employer State Unemployment Taxes ("SUI"); 26 U.S.C. §3301 *et seq*, Federal Unemployment Tax Act ("FUTA"); and New York State Metropolitan Commuter Transportation Mobility Tax ("MCTMT").

2.      The irony of this entire case should not be lost as Defendants were simply tasked with withholding the proper amount of monies required under SUI, FUTA, and MCTMT from Plaintiff's payroll; but instead, unjustifiably profited from either overcharging and/or inappropriately withholding certain monies from Plaintiff under SUI, FUTA ,and MCTMT.

3.      This action stems from events that began on or about March 2, 2000 in which Plaintiff entered into a contract ("Contract 1") for payroll services with Kelly Staff Leasing, Inc. which, upon information and belief, is now owned and/or operated by Defendant OASIS.[1]

4.      For reasons only known to Defendants, merely 20 days later, Plaintiff was required to sign a second contract ("Contract 2"), also for payroll services, but with Defendant, KSI, which at one time included a Division of its corporation called Kelly National Payroll Services.

5.      From either the inceptions of Contract 1 or Contract 2 through 2016 or, at least, during the years of 2013, 2014, 2015 and 2016, Defendants wrongfully withheld and/or overcharged Plaintiff for monetary amounts under SUI, FUTA, and MCTMT.

6.      Plaintiff demanded the return of the amount of monies Defendants overcharged and/or wrongfully withheld but Defendants failed to make Plaintiff whole.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiff is a citizen of a different state from

---

[1] https://www.oasisadvantage.com/kelly-staff-leasing/; *see also* https://www.oasisadvantage.com/kelly-staff-leasing-is-now-part-of-oasis-outsourcing/ (*all current as of November 8, 2018*)

Defendants; and that Plaintiff's class action is not covered by the provisions of 28 U.S.C. § 1332(d)(4) .

8.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because the acts of the Defendants that give rise to this action, occurred in substantial part, in this district.

## DEFINITIONS

9.      As used in reference to New York's Labor Law, "Employer" is defined at New York Labor Law §512.

10.     As used in reference to New York' Labor Law, "Wages" is defined at New York Labor Law §518.

11.     As used in reference to New York's Labor Law, "Experience Rating" is defined at New York Labor Law §581.

12.     As used in reference to New York's Tax Law, "Metropolitan commuter transportation district", "Employer" and "Payroll Expense", are defined at New York Tax Law §800.

13.     As used in reference to Internal Revenue Code, "Employer", "Wages", and "Employment" are defined at 28 U.S.C. §3306.

## PARTIES

14.     Plaintiff is a natural person, and a resident of Suffolk County, New York.

15.     Upon information and belief, Defendant, OASIS is a foreign corporation which is incorporated in the State of Florida.

16.     Upon information and belief, Defendant, OASIS is a foreign corporation which maintains a business location at 2054 Vista Parkway, Suite 300, West Palm Beach Florida 33411.

17.     Upon information and belief, KSI is a foreign corporation incorporated in the State of Delaware.

18.     Upon information and belief, KSI maintains a business location at 999 West Big Beaver Road, Troy, Michigan 48084.

19.     John Does 1-25, are fictitious names of individuals and business alleged for the purpose of substituting names of defendants whose identities will be disclosed in discovery and should be made parties to this action.


**CLASS ACTION ALLEGATIONS**

20.     Plaintiff brings this action as a nation wide class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure (hereinafter "FRCP"), on behalf of herself and all persons and their successors in interest (the "Class") who retained Defendants to be their payroll company as described in this Complaint.

This Action is properly maintained as a class action. The Class is initially defined as:

- All persons, who retained Defendants to be their payroll company, and in which Defendants engaged in the alleged conduct and practices described herein.

  The class definition may be subsequently modified or refined.

  The Class period begins six years prior to the filing of this Action.

13.     The Class satisfies all the requirements of Rule 23 of the FRCP for maintaining a class action:

- Upon information and belief, the Class is so numerous that joinder of all members is impracticable because there may be hundreds and/or thousands of persons who were entered into payroll services with Defendants where Defendants wrongfully withheld and/or overcharged Plaintiff for fees under SUI, FUTA, or MCTMT;

- There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. These common questions of law and fact include, without limitation:

    a.     Whether the Defendants breached their contract with Plaintiff and/or engaged in, unjust enrichment, fraud or conversion

    b.     Whether Plaintiff and the Class have been injured by the Defendants' conduct;

    c.     Whether Plaintiff and the Class have sustained damages and are entitled to restitution as a result of Defendants' wrongdoing and if so, what is the proper measure and appropriate statutory formula to be applied in determining such damages and restitution; and

    d.     Whether Plaintiff and the Class are entitled to declaratory and/or injunctive relief.

- Plaintiff's claims are typical of the Class, which all arise from the same operative facts and are based on the same legal theories.

- Plaintiff has no interest adverse or antagonistic to the interest of the other members of the Class.

- Plaintiff will fairly and adequately protect the interest of the Class and has retained experienced and competent attorneys to represent the Class.

- A Class Action is superior to other methods for the fair and efficient adjudication of the claims herein asserted. Plaintiff anticipates that no unusual difficulties are likely to be encountered in the management of this class action.

- A Class Action will permit large numbers of similarly situated persons to prosecute their common claims in a single forum simultaneously and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not otherwise afford to seek legal redress for the wrongs complained of herein.  Absent a Class Action, class members will continue to suffer losses of statutory protected rights as well as monetary damages.  If Defendants' conduct is allowed to proceed without remedy, they will continue to reap and retain the proceeds of their ill-gotten gains.

- Defendants acted on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**STATEMENT OF FACTS**

14.     Plaintiff is a Private Wealth Advisor with Ameriprise Financial Services, Inc. where she is a Certified Financial Planner, Chartered Retirement Planning Counselor, and Accredited Domestic Partnership Advisor.

15.     Plaintiff has operated a financial planning firm since at least the year 2000, in which she has employed several employees.

16.     Plaintiff currently owns and operates a franchise (the "franchise") of Ameriprise Financial Services, Inc.

17.     In addition to Plaintiff, the franchise has employed several other employees.

**The Two Contracts**

18.     On or about March 2, 2000, Plaintiff entered into Contract 1 for payroll services for her firm with KSI which, at one time, contained a Division called Kelly National Payroll Services, Inc. A copy of Contract 1 is annexed as **Ex. A**.

19.     Contract 1 included that KSI would be responsible for withholding taxes from Plaintiff's payroll pursuant to SUI. **Ex A**

20.     Contract 1 included that KSI would be responsible from withholding taxes from Plaintiff's payroll pursuant to FUTA. **Ex. A**.

21.     Contract 1 included that KSI would be responsible from withholding taxes from Plaintiff's payroll pursuant to MCTMT. **Ex. A**.

22.      For reasons only known to Defendants, on March 20, 2000, Plaintiff was required to sign Contract 2 for payroll services for her firm with Kelly Staff Leasing which, upon

information and belief, is now owned or operated by OASIS. A copy of Contract 2 is annexed as **Ex. B**.

23.    Contract 2 included that Kelly Staff leasing would be responsible for withholding taxes from Plaintiff's payroll pursuant to SUI. **Ex. B**

24.    Contract 2 included that Kelly Staff Leasing would be responsible for withholding taxes from Plaintiff's payroll pursuant to FUTA. **Ex. B**.

25.    Contract 2 included that Kelly Staff Leasing would be responsible for withholding taxes from Plaintiff's payroll pursuant to MCTMT. **Ex. B**.

26.    On or about January 2, 2007 OASIS acquired Kelly Staff Leasing from KSI.

27.    While Contract 1 provided that Defendants receive certain fees for their payroll work, Defendants were not entitled to either overcharges and/or wrongfully withheld monetary amounts under SUI.

28.    While Contract 2 provided that Defendants receive certain fees for their payroll work, Defendants were not entitled to either overcharges and/or wrongfully withheld monetary amounts under SUI.

29.    While Contract 1 provided that Defendants receive certain fees for their payroll work, Defendants were not entitled to either overcharges and/or wrongfully withheld monetary amounts under FUTA.

30.    While Contract 2 provided that Defendants receive certain fees for their payroll work, Defendants were not entitled to either overcharges and/or wrongfully withheld monetary amounts under FUTA.

31.     While Contract 1 provided that Defendants receive certain fees for their payroll work, Defendants were not entitled to either overcharges and/or wrongfully withheld monetary amounts under MCTMT.

32.     While Contract 2 provided that Defendants receive certain fees for their payroll work, Defendants were not entitled to either overcharges and/or wrongfully withheld monetary amounts under MCTMT.

## STATE UNEMPLOYMENT INSURANCE ("SUI")

33.     Each State of the United States of America codifies its own SUI.

34.     Plaintiff's SUI is based on New York's Labor Law, Article 18, Title 2, Section 518.

35.     Plaintiff is an "employer" pursuant to New York's Labor Law §512.

36.     New York's SUI was enacted "…for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own."

37.     Plaintiff was responsible for paying taxes under SUI based on a threshold amount of her employee's wages multiplied by the applicable New York SUI tax rate less certain credits See NY Labor Law §§ 518, 570, 577, 581

38.     The applicable SUI tax rate is calculated pursuant to New York Labor Law §570.

39.     The applicable SUI tax rate is also a function of Plaintiff's "Experience Rating". See NY Labor Law §581.

40.     Plaintiff's "Experience Rating" is further determined by both "Normal" and "Subsidiary" rates.[2] See NY Labor Law §581.

41.     The amounts of taxes under SUI were paid by Plaintiff (as the employer) and not her employees.

---

[2]See https://www.tax.ny.gov/pdf/publications/withholding/nys50.pdf  (current as of November 8 2018).

42.     Accordingly, the amounts of taxes under SUI were not deducted from Plaintiff's employee's wages.

43.     Between at least 2013 and 2016, Defendants either overcharged and/or wrongfully withheld SUI monetary amounts totaling approximately $28,255.91

44.     Plaintiff demanded the return of the amount of monies Defendants overcharged and/or wrongfully withheld under SUI but Defendants failed to make Plaintiff whole.

45.     Between at least 2013 and 2016, Defendants have failed to reimburse Plaintiff for the overcharged and/or wrongfully withheld SUI monetary amounts totaling approximately $28,255.91

## METROPOLITAN COMMUTER TRANSPORTATION MOBILITY TAC MCTMT

46.     The MCMT is codified at New York Tax Law, Article 23, *et seq.*

47.     The MCTMT is a tax imposed on certain employers and self-employed individuals engaging in business within the metropolitan commuter transportation district (MCTD). The MCTD includes the counties of New York (Manhattan), Bronx, Kings (Brooklyn), Queens, Richmond (Staten Island), Rockland, Nassau, Suffolk, Orange, Putnam, Dutchess, and Westchester.[3] See New York Tax Law §800(a).

48.     Plaintiff is an "employer" pursuant to New York Tax Law §800(b).

49.     Plaintiff was responsible for paying a "Payroll expense" for her employees pursuant to New York Tax Law §800(c).

50.     Plaintiff's MCTMT tax rate is codified at New York Tax Law §801.

---

[3] See https://www.tax.ny.gov/bus/mctmt/default.htm (*current as of November 8, 2018*)

51.    The amounts of taxes under MCTMT were paid by Plaintiff (as the employer) and not her employees.

52.    Accordingly, the amounts of taxes under MCTMT were not deducted from Plaintiff's employee's wages.

53.    Between at least 2013 and 2016, Defendants either overcharged and/or wrongfully withheld MCTMT monetary amounts totaling approximately $1,433.55.

54.    Plaintiff demanded the return of the amount of monies Defendants overcharged and/or wrongfully withheld under MCTMT but Defendants failed to make Plaintiff whole.

55.    Between at least 2013 and 2016, Defendants have failed to reimburse Plaintiff for the overcharged and/or wrongfully withheld MCTMT  monetary amounts totaling approximately $1,433.55

## <u>FEDERAL UNEMPLOYMENT TAX ACT ("FUTA")</u>

56.    FUTA is codified at 26 U.S.C. §3301 *et seq*.

57.    Plaintiff is an "Employer" pursuant to 26 U.S.C. §3306(a).

58.    Plaintiff was engaged in "Employment" of her employees pursuant to 26 U.S.C. §3306(c).

59.    Plaintiff's FUTA rate of tax is codified at 26 U.S.C. §3301 in an amount "…equal to 6 percent of the total wages (as defined in section 3306(b) [26 USCS § 3306(b)]) paid by such employer during the calendar year with respect to employment (as defined in section 3306(c) [26 USCS § 3306(c)])…" less certain credits codified at 26 U.S.C. §3302.

60.    The amounts of taxes under FUTA were paid by Plaintiff (as the employer) and not her employees.

61.     Accordingly, the amounts of taxes under FUTA were not deducted from Plaintiff's employee's wages.

62.     Between at least 2013 and 2016, Defendants either overcharged and/or wrongfully withheld FUTA monetary amounts totaling $4,293.63

63.     Plaintiff demanded the return of the amount of monies Defendants overcharged and/or wrongfully withheld under FUTA but Defendants failed to make Plaintiff whole.

64.     Between at least 2013 and 2016, Defendants have failed to reimburse Plaintiff for the overcharged and/or wrongfully withheld FUTA monetary amounts totaling $4,293.63

## POLICIES AND PRACTICES COMPLAINED OF

65.     It is Defendants' policy and practice to

(a) wrongfully withhold monetary amounts under SUI from its clients;

(b) overcharge monetary amounts under SUI from its clients;

(c) wrongfully withhold monetary amounts under MCTMT from its clients;

(d) overcharge monetary amounts under MCTMT from its clients.

(e) wrongfully withhold monetary amounts under FUTA from its clients;

(f) overcharge monetary amounts under FUTA from its clients;


66.     On information and belief, Defendants were the payroll company for at least 100 natural persons in the United States of America wherein they engaged in the complained-of violations as set forth herein.

## COUNT I

## BREACH OF CONTRACT

67.     Plaintiff, on behalf of herself and others similarly situated, repeats and realleges all prior allegations as if set forth at length herein.

68.     Under Contract 1, Plaintiff retained Kelly Staff Leasing, now owned and/or operated by OASIS, for payroll services including, but not limited to, withholding the proper amounts under SUI, FUTA, and/or MCTMT.

69.     Under Contract 2, Plaintiff retained KSI for payroll services including, but not limited to, withholding the proper amounts under SUI, FUTA, and/or MCTMT.

70.     Between at least 2013-2016, OASIS breached Contract 1 by wrongfully withholding and/or overcharging Plaintiff for the SUI monetary amounts.

71.     Between at least 2013-2016, OASIS breached Contract 1 by wrongfully withholding and/or overcharging Plaintiff for the FUTA monetary amounts

72.     Between at least 2013-2016, OASIS breached Contract 1 by wrongfully withholding and/or overcharging Plaintiff for the MCTMT monetary amounts

73.     Between at least 2013-2016, KSI breached Contract 2 by wrongfully withholding and/or overcharging Plaintiff for the SUI monetary amounts.

74.     Between at least 2013-2016, KSI breached Contract 2 by wrongfully withholding and/or overcharging Plaintiff for the FUTA monetary amounts.

75.     Between at least 2013-2016, KSI breached Contract 2 by wrongfully withholding and/or overcharging Plaintiff for the MCTMT monetary amounts.

76.     Plaintiff sustained monetary damages proximately caused by OASIS withholding and/or overcharging Plaintiff for the SUI monetary amounts.

77.     Plaintiff sustained monetary damages proximately caused by OASIS withholding and/or overcharging Plaintiff for the FUTA monetary amounts.

78.     Plaintiff sustained monetary damages proximately caused by OASIS withholding and/or overcharging Plaintiff for the MCTMT monetary amounts.

79.     Plaintiff sustained monetary damages proximately caused by KSI withholding and/or overcharging Plaintiff for the SUI monetary amounts.

80.     Plaintiff sustained monetary damages proximately caused by KSI withholding and/or overcharging Plaintiff for the FUTA monetary amounts.

81.     Plaintiff sustained monetary damages proximately caused by KSI withholding and/or overcharging Plaintiff for the MCTMT monetary amounts.


## COUNT II

## COMMON LAW FRAUD

82.     Plaintiff, on behalf of himself and others similarly situated, repeats and realleges all prior allegations as if set forth at length herein.

83.     Under Contract 1, Plaintiff retained Kelly Staff Leasing, now owned and/or operated by OASIS, for payroll services including, but not limited to, withholding the proper amounts under SUTA, FUTA and/or MCTMT.

84.     Under Contract 2, Plaintiff retained KSI for payroll services including, but not limited to, withholding the proper amounts under SUI, FUTA, and/or MCTMT.

85.     Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts.

86.     Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts.

87.     Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the MCTMT monetary amounts.

88.     Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts.

89.     Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts.

90.     Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the MCTMT  monetary amounts.

91.     OASIS has knowledge of this falsity, wherein it wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts, based on Contract 1.

92.     OASIS has knowledge of this falsity, wherein it wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts, based on Contract 1.

93.     OASIS has knowledge of this falsity, wherein it wrongfully withheld and/or overcharged Plaintiff for the MCTMT monetary amounts, based on Contract 1.

94.     KSI has knowledge of this falsity, wherein it wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts, based on Contract 2.

95.     KSI has knowledge of this falsity, wherein it wrongfully withheld and/or overcharged Plaintiff for the FUTA  monetary amounts, based on Contract 2.

96.     KSI has knowledge of this falsity, wherein it wrongfully withheld and/or overcharged Plaintiff for the MCTMT  monetary amounts, based on Contract 2.

97.     Plaintiff justifiably relied on OASIS withholding the proper monetary amounts if SUI based on Contract 1.

98.     Plaintiff justifiably relied on OASIS withholding the proper monetary amounts under FUTA based on Contract 1.

99.     Plaintiff justifiably relied on OASIS withholding the proper monetary amounts under MCTMT based on Contract 1.

100.    Plaintiff justifiably relied on KSI withholding the proper monetary amounts under SUI based on Contract 2.

101.    Plaintiff justifiably relied on KSI withholding the proper monetary amounts under FUTA based on Contract 2.

102.    Plaintiff justifiably relied on KSI withholding the proper monetary amounts under MCTMT based on Contract 2.

103.    Plaintiff sustained monetary damages by OASIS withholding and/or overcharging Plaintiff for the SUI monetary amounts.

104.    Plaintiff sustained monetary damages by OASIS withholding and/or overcharging Plaintiff for the FUTA monetary amounts.

105.    Plaintiff sustained monetary damages by OASIS withholding and/or overcharging Plaintiff for the MCTMT monetary amounts.

106.    Plaintiff sustained monetary damages by KSI withholding and/or overcharging Plaintiff for the SUI monetary amounts.

107.    Plaintiff sustained monetary damages by KSI withholding and/or overcharging Plaintiff for the FUTA monetary amounts

108.    Plaintiff sustained monetary damages by KSI withholding and/or overcharging Plaintiff for the MCTMT monetary amounts

## COUNT III

## UNJUST ENRICHMENT

109.    Plaintiff, on behalf of herself and others similarly situated, repeats and realleges all prior allegations as if set forth at length herein.

110.    Under Contract 1, Plaintiff retained Kelly Staff Leasing, now owned and/or operated by OASIS, for payroll services including, but not limited to, withholding the proper amounts under SUTA, FUTA and/or MCTMT.

111.    Under Contract 2, Plaintiff retained KSI for payroll services including, but not limited to, withholding the proper amounts under SUI, FUTA, and/or MCTMT

112.    Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts.

113.    Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts.

114.    Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the MCTMT monetary amounts.

115.    Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts.

116.    Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts.

117.    Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the MCTMT monetary amounts.

118.    Equity and good conscience require that OASIS reimburse Plaintiff for the wrongfully withheld and/or overcharged monetary amounts under SUI.

119.    Equity and good conscience require that OASIS reimburse Plaintiff for the wrongfully withheld and/or overcharged monetary amounts under FUTA.

120.    Equity and good conscience require that OASIS reimburse Plaintiff for the wrongfully withheld and/or overcharged monetary amounts under MCTMT.

121.    Equity and good conscience require that KSI reimburse Plaintiff for the wrongfully withheld and/or overcharged monetary amounts under SUI.

122.    Equity and good conscience require that KSI reimburse Plaintiff for the wrongfully withheld and/or overcharged monetary amounts under FUTA.

123.    Equity and good conscience require that KSI reimburse Plaintiff for the wrongfully withheld and/or overcharged monetary amounts under MCTMT.

**COUNT IV**

**CONVERSION**

124.    Plaintiff, on behalf of himself and others similarly situated, repeats and realleges all prior allegations as if set forth at length herein.

125. Under Contract 1, Plaintiff retained Kelly Staff Leasing, now owned and/or operated by OASIS, for payroll services including, but not limited to, withholding the proper amounts under SUI, FUTA and/or MCTMT

126. Under Contract 2, Plaintiff retained KSI for payroll services including, but not limited to, withholding the proper amounts under SUI, FUTA, and/or MCTMT

127. Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts.

128. Between at least 2013-2016, OASIS wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts.

129. Between at least 2013-2016,  OASIS wrongfully withheld and/or overcharged Plaintiff for the MCTMT monetary amounts

130. Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the SUI monetary amounts.

131. Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the FUTA monetary amounts.

132. Between at least 2013-2016, KSI wrongfully withheld and/or overcharged Plaintiff for the MCTMT monetary amounts.

133. The wrongfully withheld and/or overcharged SUI monetary amounts taken by OASIS belong to Plaintiff, and thus, Plaintiff has legal ownership of these SUI monetary amounts.

134. The wrongfully withheld and/or overcharged FUTA monetary amounts taken by OASIS belong to Plaintiff, and thus, Plaintiff has legal ownership of these FUTA monetary amounts.

135.    The wrongfully withheld and/or overcharged MCTMT monetary amounts taken by OASIS belong to Plaintiff, and thus, Plaintiff has legal ownership of these MCTMT monetary amounts.

136.    The wrongfully withheld and/or overcharged SUI monetary amounts taken by KSI belong to Plaintiff, and thus, Plaintiff has legal ownership of these SUI monetary amounts.

137.    The wrongfully withheld and/or overcharged FUTA monetary amounts taken by KSI belong to Plaintiff, and thus, Plaintiff has legal ownership of these FUTA monetary amounts.

138.    The wrongfully withheld and/or overcharged MCTMT monetary amounts taken by KSI belong to Plaintiff, and thus, Plaintiff has legal ownership of these MCTMT monetary amounts.

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

(a)    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class representative and her attorneys as Class Counsel;

(b)    Awarding Plaintiff and the Class actual damages, including but not limited to a disgorgement of all money collected during the relevant period;

(c)    Awarding pre-judgment interest;

(d)    Awarding post-judgment interest.

(e)    Awarding Plaintiff costs of this Action, including reasonable attorneys' fees and expenses; and

(f)    Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

Dated: November 8, 2018

_s/ Joseph K. Jones_
Joseph K. Jones, Esq.
JONES, WOLF & KAPASI, LLC
One Grand Central Place
60 East 42nd Street, 46th Floor
New York, New York 10165
(646) 459 7971 telephone
(646) 459 7973 facsimile
jkj@legaljones.com

_s/ Benjamin J. Wolf_
Benjamin J. Wolf, Esq.
JONES, WOLF & KAPASI, LLC
One Grand Central Place
60 East 42nd Street, 46th Floor
New York, New York 10165
(646) 459 7971 telephone
(646) 459 7973 facsimile
bwolf@legaljones.com

_/s/ Marc E. Bengualid, Esq._
Marc E. Bengualid, Esq.
Law Offices of Marc E. Bengualid, PLLC
330 West 38th Street, Suite 305
New York, NY 10018
(212) 360-5516 (telephone)
marc@bengualidlaw.com

_/s/ Etan C. Harris_
Etan C. Harris, Esq.
Law Offices of Marc E. Bengualid, PLLC
330 West 38th Street, Suite 305
New York, NY 10018
(212) 360-5516 (telephone)
etan@benguialid.com

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a

trial by jury on all issues so triable.

Dated: November 8, 2018

*s/ Joseph K. Jones*
Joseph K. Jones, Esq.

# Exhibit

# A

KELLY STAFF LEASING, INC.

# HUMAN RESOURCE SERVICES AGREEMENT

тHIS AGREEMENT is made this ___2nd___ day of ___March___ , ___2000___ , by and between **KELLY STAFF LEASING, INC.**, a California Corporation ("**KELLY STAFF LEASING**"), with its principal offices located at 110 West A Street, Suite 1700, San Diego, California   and   ___Marcia Namowitz/RAEFA_____ ("**CLIENT**"). **KELLY STAFF LEASING** and **CLIENT** hereby agree to the following:

---

### I. PERSONNEL SUPPLIED BY KELLY STAFF LEASING TO CLIENT

---

**KELLY STAFF LEASING** hereby agrees to supply to **CLIENT**, and **CLIENT** hereby agrees to engage the services of **KELLY STAFF LEASING** to provide Personnel who shall fill employment positions as mutually agreed upon.  **KELLY STAFF LEASING** and **CLIENT** acknowledge that this Agreement creates an employee leasing relationship.

---

### II. SERVICES AND BENEFITS PROVIDED BY KELLY STAFF LEASING FOR SUPPLIED PERSONNEL

---

During the term of this Agreement, **KELLY STAFF LEASING** agrees to provide the following services and benefits:

2.1   Timely Payment of Wages.  **KELLY STAFF LEASING** shall timely pay the wages and related payroll taxes of the Supplied Personnel from **KELLY STAFF LEASING**'s own account.

2.2   Workers' Compensation, Safety, and Health Compliance and Administration.  To the extent required by applicable law, **KELLY STAFF LEASING** shall maintain and administer a proactive workers' compensation, safety, and health system as follows:
    i.   Maintain in effect worker's compensation coverage covering all Supplied Personnel.
    ii.   Complete and file all required workers' compensation forms and reports.
    iii.   Provide a workers' compensation claims coordinator to administer all workers' compensation claims covering the Supplied Personnel.
    iv.   Provide training for administration and management of **CLIENT**'s loss prevention program including appropriate training of **CLIENT**'s on-site loss prevention manager and other supervisors, provision of a loss prevention manual and materials for loss prevention meetings.
    v.   Assist **CLIENT** in establishing a "modified return to work" program.
    vi.   Maintain close contact with injured Personnel.
    vii.   Collect from **CLIENT** and pay the appropriate workers' compensation charges.  While the **CLIENT** maintains primary responsibility and ownership of the worksite, **KELLY STAFF LEASING** retains a right over management of work-site safety, and the right to inspect the premises to insure that assigned workers are working in a safe environment.
    viii.   Upon its receipt of a written request from **CLIENT**, **KELLY STAFF LEASING** shall deliver to **CLIENT** a Certificate evidencing **KELLY STAFF LEASING**'s workers' compensation coverage on behalf of the Supplied Personnel.

2.3   Employee Benefits. **KELLY STAFF LEASING** shall provide and explain to Supplied Personnel those employee benefits set forth in Exhibit B.

2.4   Compliance with COBRA. During the term of this Agreement, **KELLY STAFF LEASING** shall comply with all applicable provisions of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") as they pertain to the Supplied Personnel.

2.5   Maintenance and Retention of Payroll and Benefit Records. **KELLY STAFF LEASING** shall maintain complete records of all wages, benefits and personnel actions paid or taken by **KELLY STAFF LEASING** in connection with any of the Supplied Personnel, and shall retain control of such records at such **KELLY STAFF LEASING** location as shall be determined solely by **KELLY STAFF LEASING**, but shall make such records available as required by applicable federal, state or local laws.

2.6   Employee Handbook. **KELLY STAFF LEASING** shall provide each of the Supplied Personnel with a generic Employee Handbook.

Page 1 of 6          KELLY STAFF LEASING'S Initials _W J K_

CLIENT's Initials _MN_

KELLY STAFF LEASING, INC.

7    Monitoring and Recommending Changes to CLIENT in Employment Policies. KELLY STAFF LEASING shall periodically review and recommend to CLIENT any necessary changes in employment policies affecting the Supplied Personnel resulting

from changes in government regulations including, but not limited to, issues such as recruiting, interviewing, testing, selection, orientation, training, evaluating, replacing, supervising, disciplining and terminating employees.

2.8    Immigration Reform and Control Act of 1986. KELLY STAFF LEASING shall comply with applicable provisions of the Immigration Reform and Control Act of 1986 with respect to the Supplied Personnel.

2.9    Compliance With Federal and State Laws. KELLY STAFF LEASING will provide the following services to CLIENT:
      i.   Negotiate with CLIENT for such matters as time, place, type of work, working conditions, quality, and price of the services for the Supplied Personnel.
      ii.   Determine assignments or reassignments of Supplied Personnel, even though Supplied Personnel retain the right to refuse specific assignments.
      iii.   Retain the authority to assign or reassign Supplied Personnel to other CLIENTS when a worker is determined unacceptable by a specific CLIENT.
      iv.   Assign or reassign Supplied Personnel to perform services for a CLIENT.
      v.   Set the rate of pay of the Supplied Personnel, whether or not through negotiation.
      vi.   Retain the right to hire and terminate Supplied Personnel.

---

### III. FEES PAYABLE TO KELLY STAFF LEASING

---

3.1    CLIENT hereby agrees to pay KELLY STAFF LEASING fees as agreed upon by KELLY STAFF LEASING and CLIENT for services performed by KELLY STAFF LEASING as indicated in the attached fee schedule (Exhibit A).

3.2    KELLY STAFF LEASING can adjust fees to include mandated tax increase, i.e. FICA, FUTA, SUI, Workers Compensation, State Sales Tax, etc., when they become effective. KELLY STAFF LEASING may also adjust employer benefit contribution amounts by providing the CLIENT with a written thirty (30) day notice.

3.3    Notification of KELLY STAFF LEASING of Errors in Amount of Fees. CLIENT shall notify KELLY STAFF LEASING, in writing, of any errors in the amount of the Fees set forth on any Fee statement delivered by KELLY STAFF LEASING to CLIENT. CLIENT's written notification of any errors must be received by KELLY STAFF LEASING within thirty (30) days after CLIENT's receipt of the applicable statement from KELLY STAFF LEASING. If CLIENT fails to notify KELLY STAFF LEASING of any errors in the applicable Fee statement within the thirty (30) day period described in this Paragraph 3.3, then CLIENT shall be deemed to have accepted the amount of Fees set forth on the applicable Fee statement as the correct amount, and CLIENT shall have no further right to seek reimbursement from KELLY STAFF LEASING for any excess payments.

3.4    Returned Checks-Additional Late Payment Fee. If any of CLIENT's checks are returned unpaid by CLIENT's bank or other financial institution, or represent less than full payment, CLIENT shall pay KELLY STAFF LEASING, on demand, an amount equal to three percent (3%) of the amount of the unpaid check.

3.5    Delinquent Fees. CLIENT acknowledges that its failure to pay Fees when due will result in additional expense to KELLY STAFF LEASING. Therefore, CLIENT agrees to pay, on demand, an amount equal to three percent (3%) of any delinquent payment. In addition, CLIENT shall pay to KELLY STAFF LEASING, on demand, an amount equal to one and one-half percent (1 ½%) per calendar month of the total amount of any delinquent payment until it is paid in full. Delinquent Fees may be assigned to an outside party, which would include a collection agency or attorney, for collection. If Fees are assigned, CLIENT agrees to be responsible for all collection charges, attorney fees and court costs incurred in order to collect these Delinquent Fees.

---

### IV. INSURANCE

---

1    Maintenance of General Liability Insurance of CLIENT. CLIENT agrees to maintain in full force and effect at all times during the term of this Agreement a comprehensive general Liability and professional Liability (if applicable) insurance policy or

KELLY STAFF LEASING, INC.

policies, with minimum coverage in the amount of three hundred thousand dollars ($300,000) combined single limit (CSL). At a minimum, the Policies shall insure **CLIENT** against bodily injury and property damage liability caused by **CLIENT's** on premises business operations, completed operations and/or products or professional service, and non-owned automobile coverage.

4.2 <u>KELLY STAFF LEASING to be Issued a Certificate of Insurance.</u> **CLIENT** shall provide **KELLY STAFF LEASING** with one or more Certificates of Insurance within forty-five (45) days after the execution of this Agreement, verifying **CLIENT's** compliance with the provisions of Paragraph 4.1. **CLIENT** further agrees that each Certificate of Insurance delivered to **KELLY STAFF LEASING** shall provide that thirty (30) days prior written notice of cancellation shall be delivered to **KELLY STAFF LEASING** prior to the cancellation of, or any material change to, any of the Policies.

4.3 <u>Automobile Liability Insurance to be Maintained by CLIENT.</u> If any of the Supplied Personnel drives any vehicle for any reason in connection with **CLIENT's** business operations, **CLIENT** shall maintain in effect one or more policies of automobile liability insurance which shall insure Supplied Personnel and **CLIENT** against public liability for bodily injury, death and property damage, with minimum coverage in the amount of three hundred thousand dollars ($300,000) combined single limit (CSL).

4.4 <u>KELLY STAFF LEASING Not required to Maintain General Liability or Automobile Insurance.</u> **CLIENT** agrees that **KELLY STAFF LEASING** shall not provide any general liability insurance coverage for products liability, completed operations, or professional liability for any of the Supplied Personnel or for **CLIENT.** **CLIENT** further agrees that **KELLY STAFF LEASING** shall have no obligation to provide any form of automobile insurance coverage on behalf of any of the Supplied Personnel or for **CLIENT.**

4.5 <u>Waiver of Subrogation Rights.</u> **KELLY STAFF LEASING** and **CLIENT** hereby waive any claims against the other by way of subrogation or otherwise, which arise during the term of this Agreement, for any and all bodily injury, loss of, or damage to, any of their property, which loss or damage is covered by policies of insurance, to the extent that such loss or damage is recovered under such policies of insurance. **KELLY STAFF LEASING** and **CLIENT** further agree to immediately give each insurance carrier which insures any of their property, written notice of the terms of the mutual waiver contained in this Paragraph 4.5. **KELLY STAFF LEASING** and **CLIENT** further agree to properly endorse any of these policies, if necessary, to prevent the invalidation of the applicable insurance coverage as a consequence of the waiver contained in this Paragraph. Each of the parties agrees to cause its insurance carriers to provide the other party with written acknowledgement of such waiver.

## V. DURATION AND TERMINATION OF AGREEMENT

5.1 This Agreement shall become effective on the first day of the first pay period for Supplied Personnel and shall continue in effect thereafter until it is terminated in accordance with the remaining provisions of this Section V. For the purposes of the Agreement, the date on which this Agreement is terminated shall be referred to as the "Termination Date."

5.2 <u>Notice of Termination.</u> This Agreement may be terminated by either party, for any reason, by delivering written notice of termination to the other party, at least thirty (30) days prior to the Termination Date.

5.3 <u>Termination of Agreement for Failure to Pay Fees.</u> If **CLIENT** fails to timely pay Fees, **KELLY STAFF LEASING** shall have the right to immediately terminate this Agreement.

5.4 <u>Immediate Termination Upon Material Breach of Agreement by Client.</u> This Agreement shall immediately terminate upon the occurrence of a material breach by **CLIENT** of any provision of this Agreement. (See Exhibit D)

5.5 <u>Effect of Termination of Agreement on the Supplied Personnel.</u> Upon the termination of this Agreement pursuant to the provisions of this Article V, **KELLY STAFF LEASING** reserves the right to extend continued employment to the Supplied Personnel covered by this Agreement.

## VI. LIABILITY FOR ACTS, ERRORS AND OMISSIONS OF THE PERSONNEL

5.1 **CLIENT** acknowledges and agrees that **CLIENT** is solely responsible for the accounting and other internal financial and control procedures used by **CLIENT** in its business. Therefore, **KELLY STAFF LEASING** shall not be responsible to **CLIENT** or to any

KELLY STAFF LEASING, INC.

other person or entity, for any loss incurred by **CLIENT** or any other person or entity, resulting from any intentional or negligent act or omission of any of the Supplied Personnel.

---

### VII. DISCLOSURE AND INDEMNIFICATION PROVISIONS

7.1    <u>Indemnification of CLIENT by KELLY STAFF LEASING.</u> **KELLY STAFF LEASING** agrees to indemnify and hold **CLIENT** harmless from any and all intentional or negligent acts or omissions of **KELLY STAFF LEASING** in connection with its performance of its duties under this Agreement.

7.2    <u>Indemnification of KELLY STAFF LEASING by CLIENT.</u> **CLIENT** agrees to indemnify and hold **KELLY STAFF LEASING** harmless from and against any claims made against **KELLY STAFF LEASING**, by any of the Supplied Personnel or on behalf of the Supplied Personnel, or by third parties as a result of the actions of the Supplied Personnel, or by actions of governmental agencies, resulting from any claimed or actual actions, conduct or directions of **CLIENT** or its agents prior to or during the term of this Agreement.

   **CLIENT** further agrees to pay for and hold **KELLY STAFF LEASING** harmless from and against any workers' compensation claims, expenses and liabilities arising from claims, actions or incidents of negligence, other tortuous conduct, criminal, or dishonest activity attributed to any of the Supplied Personnel, which occurred prior to the effective date of this Agreement.

7.3    <u>General Indemnity Provisions.</u> **CLIENT** agrees to assume the defense of **KELLY STAFF LEASING** against the claims and actions described in Paragraph 7.2 in a timely manner.  If **CLIENT** fails to do so, **KELLY STAFF LEASING** may compromise and settle or defend against any such claims or actions, and **CLIENT** shall be obligated to indemnify and hold **KELLY STAFF LEASING** harmless for all costs of defense, compromise and settlement, including any judgments incurred or rendered by or against **KELLY STAFF LEASING**, which arise out of the claims or actions described in Paragraph 7.2.

   **CLIENT** will defend, indemnify and hold **KELLY STAFF LEASING** harmless against any and all actions described in Paragraph 7.2 and 7.3, even if there are allegations of negligence, gross negligence, intentional wrongdoing or any other wrongdoing against **KELLY STAFF LEASING**, provided **KELLY STAFF LEASING** assumes its liability for its actions.

7.4    <u>Survival of Indemnification Provisions.</u> The provisions of this Article VII shall survive the expiration or other termination of this Agreement.

---

### VIII. EXHIBITS

The following Exhibits are referred to in prior sections of this Agreement.  Such Exhibits shall constitute a part of this Agreement, only if and to the extent they are attached to this Agreement and identified as Exhibits to this Agreement, as initialed by **CLIENT** below.

_MN_   Exhibit A - Client Service Fee Schedule         _MN_   Exhibit E - Personal Employee Profile

_MN_   Exhibit B - Employee Benefits Provided by KELLY STAFF LEASSING      _MN_   Exhibit F - Rights and Obligations

_MN_   Exhibit C - Performance Assurance Payment        _MN_   Exhibit G - Continuing Guaranty

_MN_   Exhibit D - Breach of Agreement

---

### IX. ADDITIONAL PROVISIONS

9.1    <u>Amendments.</u> This Agreement, including any exhibits and schedules, may be amended at any time and from time to time, but any amendment must be in writing and signed by all of the parties to this Agreement, except for changes to the Fee Schedule as set forth in Section III.

9.2    <u>Arbitration.</u> Any dispute arising under this Agreement shall be resolved by final and binding arbitration in accordance with the prevailing rules and regulations of the American Arbitration Association in Los Angeles, California.  All of the parties to this Agreement agree to be bound by the decision of the arbitration proceeding.

KELLY STAFF LEASING'S Initials _WJK_

                                                CLIENT's Initials    _MN_

KELLY STAFF LEASING, INC.

9.3 <u>Attorney's Fees.</u> In the event that the parties hereto become involved in any arbitration arising out of this Agreement or the performance of any of its provisions, the arbitrator shall award attorney's fees and costs to the prevailing party whenever said party wholly or partially prevails in any arbitration. The attorney's fees and costs award shall be such as to fully reimburse all attorney's fees and costs actually incurred in good faith, and shall not be limited by any statutory or arbitration schedule.

9.4 <u>Binding Effect.</u> This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, successors, representatives and assigns. This Agreement is assignable by **KELLY STAFF LEASING**; however, **CLIENT** may not assign its rights and delegate its duties hereunder without the express written consent of **KELLY STAFF LEASING.**

9.5 <u>Choice of Law.</u> It is the intention of the parties that the laws of the State of California shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

9.6 <u>Counterpart Execution.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one agreement.

9.7 <u>Definitions.</u> Terms and phrases which are defined in any part of this Agreement shall have the defined meanings wherever used throughout the Agreement. The terms "hereunder" and "herein" and similar terms used in this Agreement shall refer to this Agreement in its entirety and not merely to the section, paragraph or subparagraph in which the term is used.

9.8 <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between the parties hereto, and contains all of the terms, conditions, covenants, stipulations, understandings and provisions agreed upon by the parties. This Agreement supersedes and takes precedence over all proposals, memorandum agreement, tentative agreements, and oral agreements between the parties, made prior to and including the date hereof, and not specifically identified and incorporated in writing into this Agreement. No agent or representative of either party hereto has authority to make, and the parties shall not be bound by or liable for, any statement, representation, promise, or agreement not specifically set forth in this Agreement.

9.9 <u>Further Assurances.</u> Each of the parties shall execute and deliver any and all additional papers, documents, and other assurances and shall do any and all acts and things reasonably necessary in connection with the performances of their obligations hereunder and to carry out the intent of the parties hereto.

9.10 <u>Gender.</u> Whenever the context herein so requires, the masculine, feminine or neuter gender and the singular and plural number shall each be deemed to include the other.

9.11 <u>Notices.</u> Notices given under this Agreement shall be in writing and shall either be served personally or delivered by first class U.S. Mail, postage prepaid. Notices also may effectively be given by transmittal over electronic transmitting devices such as TWX, Telex, or facsimile machine if the party to whom the notice is being sent has such a device in its office, provided that a complete copy of any notice shall be mailed in the same manner as required for a mailed notice.

Notices shall be deemed received at the earlier of actual receipt or three days from Mail date. Notices shall be directed to the parties at their respective addresses shown below. A party may change its address for notice by giving written notice to all other parties in accordance with this Paragraph:

| If to **KELLY STAFF LEASING:** | Kelly Staff Leasing, Inc. | If to **CLIENT:** | Marcia Namowitz/RAEFA |
| | 110 West A St., Suite 1700 | | 333 Earle Ovington Bl. Ste. #1010 |
| | San Diego, CA 92101 | | Mitchel Field, NY 11553 |
| Facsimile: | (619) 615-7987 | Telephone: | 516-228-0100 |

9.12 <u>Paragraph Headings.</u> Paragraph and other headings contained in this Agreement are for reference purposes only, and shall not affect in any way the meaning or interpretation of this Agreement.

9.13 <u>Severability.</u> If any part or condition of this Agreement is held to be void, invalid or inoperative, such shall not affect any other

CLIENT's Initials

KELLY STAFF LEASING, INC.

provision hereof, which shall continue to be effective as though such void, invalid or inoperative part, clause or condition had not been made.

9.14 <u>Waiver of Provisions.</u> The failure by one party to require performance by the other party, shall not be deemed to be a waiver of any such breach, nor of any subsequent breach by the other party of any provision of this Agreement. Such waiver shall not affect the validity of this Agreement, nor prejudice either party's rights in connection with any subsequent action.

9.15 This agreement shall not take effect until accepted by **KELLY STAFF LEASING**. Acceptance shall be evidenced by execution of this document by a duly authorized agent of **KELLY STAFF LEASING**. A copy of the executed Agreement shall then be returned to **CLIENT**.

Signed and Agreed to as of the dates indicated:

KELLY STAFF LEASING INC.                                    CLIENT

By: _____   3/27/200    By: _____   3/9/00
              Signature                      Date              Signature              Date

William J. Kwasniewski                            Marcia Namowitz
Printed or Typed Name                           Printed or Typed Name

Director of Finance                              Certified Financial Planner
        Title                                          Title

KELLY STAFF LEASING, INC.                                                    EXHIBIT A-2

# CLIENT SERVICE FEE SCHEDULE

This Fee Schedule has been prepared exclusively for:     Marcia Namowitz/RAEFA          Date:
03/02/2000

### THE CLIENT SERVICE FEE IS THE TOTAL OF ALL SECTIONS OF THIS SCHEDULE.

A.      **GROSS WAGES OF THE SUPPLIED PERSONNEL**...................................................     100%
        Gross wages include all applicable paid time off and overtime at required schedules.

B.      **EMPLOYMENT ASSESMENTS** (As a percentage of A)......................................................

        This assessment will be reduced by the current FICA (OASDI) and FICA (HI) rates when each Supplied Personnel
        reaches the maximum earnings for these assessments.  This assessment includes but is not exclusive of the following:

        Classification by Job Description:              NY 8810

        | | |
        |---|---|
        | Employer Social Security Taxes (FICA) | Included |
        | Employer State Unemployment Taxes (SUI) | Included |
        | Employer Federal Unemployment Taxes (FUTA) | Included |
        | Loss Prevention Management Program | Included |
        | Workers' Compensation Coverage* | Included |
        | Workers' Compensation Administration | Included |
        | I.R.S. Compliance | Included |
        | Human Resources Administration | Included |
        | Legal Documentation (I-9, EEOC, etc.) | Included |
        | Employee Handbook and Forms | Included |

                        **Total:**              18.95     %

### EMPLOYEE BENEFITS PLAN

**NOTE:**   All Supplied Personnel who work 30 hours of more per week are eligible to be offered the employee health
            benefit plan.  Supplied Personnel must satisfy designated waiting period to qualify for health benefits.

### OTHER FEES
(1)  **Check Delivery Fee** (UPS included; any other method at cost = 10%)
(2)  **New Personnel Enrollment Fee** (Per each new Supplied Personnel) ................................     $      0
(3)  **Terminated Personnel Fee** (Per each new Supplied Personnel) ................................     $      0

C.      **ADDITIONAL SERVICES** (As requested)

### METHOD OF PAYMENT

        AUTOMATIC DEBIT

**KELLY STAFF LEASING APPROVAL:**

By      William J. Kwasniewski, Dir. – Fin.     Signature: _W.J. Kwasniewski_ •     Effective Date: _____

                                Date: _____

KELLY STAFF LEASING, INC.                                                    EXHIBIT C

# PERFORMANCE ASSURANCE PAYMENT

For **CLIENT:**     Marcia Namowitz/RAEFA                    Date:    03/02/2000

( a )   **CLIENT** shall maintain, at all times, a Performance Assurance Payment with **KELLY STAFF LEASING** in an
Amount equal to 10% higher than an average regular invoice; said amount is initially agreed to be
_____ Waived _____ Dollars   ($ _____ ).

( b )   Should **CLIENT** fail to pay **KELLY STAFF LEASING** any payment when due, **KELLY STAFF LEASING** may at its
option apply the Performance Assurance Payment to any amounts due or exercise any other rights it has under
this Agreement.

( c )   Should the Performance Assurance Payment fall below the required amount, **CLIENT** shall pay **KELLY STAFF
LEASING** within four (4) days of notification by **KELLY STAFF LEASING** an amount sufficient to maintain the
Required Performance Assurance Payment.

( d )   The Performance Assurance Payment is placed with **KELLY STAFF LEASING** to guarantee **CLIENT's** performance of all
all terms, covenants, conditions and obligations under this Agreement.

( e )   **KELLY STAFF LEASING** shall refund any remaining Performance Assurance Payment to **CLIENT** within (60) sixty days
after the termination of this Agreement, provided **CLIENT** has performed each of **CLIENT's** obligations under this
Agreement.

# BREACH OF AGREEMENT BY CLIENT                              EXHIBIT D

For **CLIENT:**     Marcia Namowitz/RAEFA                    Date:    03/02/2000

**CLIENT** agrees that any one of the following shall be deemed a material breach of this Agreement by **CLIENT:**

( a )   **CLIENT's** failure to timely pay any Fees or other monies required to be paid by **CLIENT** under the terms and
conditions of this Agreement;

( b )   **CLIENT's** failure to comply with any directive regarding health and Loss Prevention from **KELLY STAFF LEASING**,
or from any applicable governmental agency;

( c )   The filing by or against **CLIENT** of any petition for bankruptcy, receivership, insolvency or the making by
**CLIENT** of an assignment for the benefit of creditors;

( d )   Failure of **CLIENT** to timely provide the signed and completed "Personal Employee Profile" on each of the
Supplied Personnel.

<u>Termination of Agreement for Material Breach.</u>  If **CLIENT** materially breaches this Agreement, **KELLY STAFF LEASING** shall have
the right to immediately terminate this Agreement, by giving written notice of termination to **CLIENT**. The Termination Date shall be
deemed to be the date on which the material breach occurred, notwithstanding the fact that **KELLY STAFF LEASING** delivers notice
of termination to **CLIENT** subsequent to the date of the material breach.

KSLREV 8/28/99                                    KELLY STAFF LEASING'S Initials _____

                                                              CLIENT's Initials _____

KELLY STAFF LEASING, INC.            EXHIBIT E

For CLIENT:  Marcia Namowitz/RAEFA      / (To be completed by each employee)    DATE:  03/02/2000



## PERSONAL EMPLOYEE PROFILE

**STAFF LEASING**     *Please Type of Print in Black Ink*

**PART I:  To be completed by Employee:**



Last Name          First Name          Social Security
                     MI

Street Addr          tment/P.O. Bc

City          e Phone

Work Phone          n Reg No. (if ap )      Exp on Date

Emergency    Name        Relationship

**Race:**                            **Gender:**       **Veteran Status:**

_____ Am. Indian/Alaskan Native    _____ Black      _____ Female      _____ Vietnam Vet

_____ Asian/Pacific Islander       _____ White      _____ Male      _____ Other Vet

_____ Hispanic                _____ Other

I agree to enter into an employment relationship with Kelly Staff Leasing under the terms described in the Employee Handbook with addendum.: Policies and benefits may be changed at the discretion of Kelly Staff Leasing without prior notification.  Material changes will be relayed to employees through the usual method of communication.  I understand that I may be required to successfully complete a pre-employment physical, to include drug screening for initial and continued employment.  I further understand that employment with Kelly Staff Leasing is at will.  My at-will status cannot be altered except in writing signed by a senior executive of Kelly Staff Leasing and/or the workplace employer.  I further agree that I will abide by all the rules, regulations and policies of Kelly Staff Leasing or companies represented by Kelly Staff Leasing and that failure to do nay result in termination.

Employee Signature _____      Date: _____

**PART II:  To be completed by Workplace Employer:**

Job Title          Workpl yer Name

KSL Hire       Employer Hire      Ra      dard Hrs/Pay od

_____ Hourl      _____ Ex   ke      Physical es:

_____ Salaried     _____ No ke

_____ Comr sior   _____ R

_____ Piec k     _____ T

_____ Othe       acation ho transferred to K Staff Leasing:

The followin should be uded n this for se ick hours ferred to Kelly ng:

_____ W-4 (r uired)      KSL for p asing:

_____ INS I-9 form (required)      ob Description (optional)

_____ Copy of I-9 documents (required)      _____ Employee Handbook Acknowledgment (required)

_____ Resume (optional)      _____ Tax Info Request

     _____ State Tax Withholding form (if applicable)

Workplace Employer Signature _____      Date: _____

**Part III:  To be completed by Kelly Staff Leasing:**

Status: _____ New Hire      _____ Rehire      WC Code: _____

*Kelly Staff Leasing is a subsidiary of Kelly Services, Inc.*                      KSL #21 2/99

## SAMPLE ONLY – DO NOT FILL IN ABOVE THIS LINE

CLIENT agrees to provide a completed and signed Personal Employee Profile, as illustrated above, on each of the Supplied Personnel, no later than the requested **KELLY STAFF LEASING** Hire Date.

KSLREV 8/28/99

KELLY STAFF LEASING'S Initials _____

CLIENT's Initials _____

KELLY STAFF LEASING, INC.                                                      EXHIBIT F

# RIGHTS AND OBLIGATIONS

For CLIENT:   Marcia Namowitz/RAEFA                          Date:   03/02/2000

As part of the employee leasing relationship, it is understood that the employer responsibilities of **CLIENT** are allocated as follows:

**CLIENT** hereby agrees to be solely responsible for the following:

( a )   That portion of the day-to-day supervision and control of the work to be performed by the Supplied Personnel, including attendance at work, as shall be necessary to achieve the objectives and results determined by **CLIENT**. In addition, **CLIENT** shall establish and maintain the general procedures to be followed by the Supplied Personnel regarding the performance of their duties on behalf of **CLIENT**;

( b )   The selection of fringe benefits to be provided to the Supplied Personnel, including but not limited to, holidays, vacations, sick leave and maternity leave, and other permissible leaves of absence. This selection is subject to the approval of **KELLY STAFF LEASING**, with negotiations between **KELLY STAFF LEASING** and **CLIENT**, and with appropriate involvement of the Supplied Personnel, and subject to applicable state and local law;

( c )   Unless **KELLY STAFF LEASING** and **CLIENT** otherwise agree in writing, recruiting, interviewing, job training, work evaluation, supervision and discipline of each of the Supplied Personnel;

( d )   Compliance with all applicable federal, state and local laws and regulations relating to a safe and accessible work environment, including the provision of proper safety equipment, including, but not limited to federal and state Occupational Safety and Health Administration ("OSHA") laws and regulations, and the Americans with Disabilities Act (the "ADA") and its regulations;

( e )   Any fidelity bonding required by job specifications for any of the Supplied Personnel;

( f )   Compliance with the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, in connection with any applicable employee benefit plans maintained by **CLIENT**;

( g )   Compliance with the applicable provisions of Sections 414(m) and 414(n) of the Internal Revenue Code of 1986, relating to the avoidance of certain pension and non-pension employee benefits requirements, in connection with benefits provided by **CLIENT** for which Sections 414(m) and 414(n) are applicable;

( h )   Any and all payments that **CLIENT** is responsible for as a result of **CLIENT** establishing any qualified or non-qualified retirement or deferred compensation plans;

( I )   Errors and omissions of the Supplied Personnel; and

( j )   Implementation of Internal Control Procedures.  In the event that the Supplied Personnel are required, in the course of performing duties for **CLIENT**, to deal with confidential information, cash, high value items, or such other matters as **CLIENT** would treat as material elements of its business, the **CLIENT** will institute written internal control procedures related to such activities.

Joint Obligations of KELLY STAFF LEASING and CLIENT.  **KELLY STAFF LEASING** and **CLIENT** agree that they shall be jointly responsible for compliance with the provisions of the following Paragraphs (a) through (d). In the event any monetary damages are payable by **KELLY STAFF LEASING** or **CLIENT** to any third party as a result of **KELLY STAFF LEASING's** or **CLIENT's** non-compliance with this Section, and in the event that **KELLY STAFF LEASING** and **CLIENT** cannot agree on the allocation of responsibility for the payment of said loss, **CLIENT** and **KELLY STAFF LEASING** agree to submit to arbitration, as defined in this Agreement, the allocation of responsibility for the payment of said loss.

( a )   Compliance with Title VII of the Civil Rights Act of 1984, the Age Discrimination in Employment Act, and those additional federal, state, and local employment discrimination laws and regulations which are enacted subsequent to the date of this Agreement; and

KSLREV 8/28/99                                          KELLY STAFF LEASING'S Initials _____

                                                        CLIENT's Initials _____

KELLY STAFF LEASING, INC.                                                    EXHIBIT F

( b )   Compliance with the Employment Retirement Income Security act of 1974 ("ERISA"), as amended, including the provisions of section 414(n) of the Internal Revenue Code, and the regulations issued under Section 414(n);

( c )   Compliance with the provisions of Title I of the Americans with Disabilities Act ("ADA"), including the rules and regulations issued pursuant to the ADA; and

( d )   Compliance with Fair Labor Standards Act and the regulations issued pursuant to such Act, and any similar state or local law.

Additional Obligations of CLIENT.

( a )   Appointment of KELLY STAFF LEASING Liaison.  KELLY STAFF LEASING and CLIENT shall mutually agree to the appointment of one or more of the Supplied Personnel as liaisons between KELLY STAFF LEASING and CLIENT.  Any individual appointed as a liaison shall cooperate with KELLY STAFF LEASING in coordinating operational and administrative matters relating to services and benefits provided by KELLY STAFF LEASING under this Agreement.

( b )   Notification to KELLY STAFF LEASING of Changes in Status of Any of the Supplied Personnel.  CLIENT shall have a right to reject or have reassigned any of the Supplied Personnel, and a right to negotiate with KELLY STAFF LEASING for any increase or decrease in the wages payable to any of the Supplied Personnel, provided that CLIENT complies with all applicable federal, state and local laws in taking any of these actions.

( c )   Time Cards and Documentation of Services Performed by the Supplied Personnel.  CLIENT agrees that it shall be solely responsible for the accuracy of records documenting the actual hours of services performed by each of the Supplied Personnel on behalf of CLIENT.  KELLY STAFF LEASING shall have the right to verify the accuracy of said records and has a right to rely on the CLIENT's representation of the accuracy of said records.  CLIENT agrees that it shall report hours and earned pay information timely for the preparation of payroll checks for the Supplied Personnel.  CLIENT also agrees to keep the original time records for a period of seven (7) years.

( d )   Prohibition on Payment of Wages to the Supplied Personnel by CLIENT.  CLIENT agrees that CLIENT shall not, directly or indirectly, pay any salary, wages, bonuses, or any other form of compensation, to the Supplied Personnel.  CLIENT further agrees that CLIENT shall not, directly or indirectly, provide any employee benefits to the Supplied Personnel, unless approved in writing by KELLY STAFF LEASING.  The prohibitions contained in this Paragraph shall not apply to:  (1) the inclusion of any of the Supplied Personnel in any one or more qualified retirements plans in which the CLIENT is a participating employer; or (2) providing any of the Supplied Personnel with any benefits under a SEP-IRA program.

( e )   Licenses and Permits for Operation of CLIENT's Business.  CLIENT agrees that is shall obtain and pay the costs of any required federal, state, county or municipal licenses or permits required in connection with the operation of its business or its utilization of the services of any of the Supplied Personnel.  CLIENT agrees that KELLY STAFF LEASING shall have no duties or responsibilities under this Agreement in connection with such licenses and permits.

( f )   Reporting of On-the-Job Illness.  CLIENT shall report all on-the-job illnesses, accidents and injuries of the Supplied Personnel to KELLY STAFF LEASING immediately (within 24 hours) upon notification of said injury by employee or employee's representative.  A written report of an accident or injury shall be delivered to KELLY STAFF LEASING not later than three (3) days after the occurrence of the accident or injury.  CLIENT's failure to timely report an injury may result in a substantial fine pursuant to applicable law.  Any fines or any other costs incurred by KELLY STAFF LEASING as a consequence of CLIENT's failure to comply with the provisions of this Paragraph shall be the sole responsibility of CLIENT.

( g )   Notification of Possible Layoffs and Business Closings.  In order to enable KELLY STAFF LEASING to comply with any applicable provisions of the Worker Adjustment and Retraining Notification Act ("WARN Act"), CLIENT shall deliver to KELLY STAFF LEASING ninety (90) days' prior written notice of any possible layoffs of the Supplied Personnel and of any closings of any business facility utilized by CLIENT.

KSLREV 8/28/99                                    KELLY STAFF LEASING'S Initials _____

                                                 CLIENT's Initials _____

KELLY STAFF LEASING, INC.                                                                    EXHIBIT  G

# CONTINUING GUARANTY

_ or CLIENT:    Marcia Namowitz/RAEFA                                  Date:    03/02/2000

For valuable consideration, the undersigned (hereinafter called Guarantors) jointly and severally unconditionally guarantee and promise to pay **KELLY STAFF LEASING INC.** (hereinafter called **KELLY STAFF LEASING**) or order, on demand, in lawful money of the United States any and all indebtedness of        Marcia Namowitz/RAEFA
(hereinafter called **CLIENT**) to **KELLY STAFF LEASING**.
The word "indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of **CLIENT** or any one or more of them, heretofore, now, or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether **CLIENT** may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter become barred by any statute of limitations, or whether such indebtedness may or hereafter become otherwise unenforceable.

This is a continuing guaranty relating to any indebtedness, including but not limited to that arising under successive transactions which shall continue the indebtedness or create new indebtedness after satisfaction, payment or reduction of previous indebtedness.  The amount of **Guarantors'** liability hereunder and under any other agreement now or at any time hereafter in force between **Guarantors** and **KELLY STAFF LEASING**, including any other guarantee executed by **Guarantors** relating to any indebtedness of **CLIENT** to **KELLY STAFF LEASING**, shall be cumulative and not alternative.  This is a continuing guaranty and **Guarantors** agree that it shall remain in full force until and unless **Guarantors** deliver to **KELLY STAFF LEASING** written notice that it has been revoked as to indebtedness incurred subsequent to the effective time of revocation as herein provided.  Delivery of such notice shall not affect any of **Guarantors'** obligations hereunder with respect to indebtedness incurred prior to the effective date of such revocation nor shall it affect any of the obligations of any other guarantor for the credit granted to or indebtedness incurred by **CLIENT**.

The obligations hereunder are joint and several and independent of the obligations of **CLIENT**, and a separate action or actions may be brought and prosecuted against **Guarantors** whether action is brought against **CLIENT** or whether **CLIENT** be joined in any such ˀction or actions; and **Guarantors** waive the benefit of any statute of limitations affecting their liability hereunder or the enforcement .ereof.

Either before or after revocation hereof, **Guarantors** authorize **KELLY STAFF LEASING**, without notice or demand and without affecting their liability hereunder, from time to time to (a) renew, compromise, extend, accelerate or otherwise change the time for ˉ payment of, or otherwise change the terms of the indebtedness or any part thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this guaranty or the indebtedness guaranteed, and exchange, enforce, waive and release any such security; (c) apply such security and direct the order or manner of sale thereof as **KELLY STAFF LEASING** in its discretion may determine; and (d) release or substitute any one or more endorsers or **Guarantors**.  **KELLY STAFF LEASING** may without notice assign this guaranty in whole or in part.

**Guarantors** waive any right to require **KELLY STAFF LEASING** to (a) proceed against **CLIENT**; (b) proceed against or exhaust any security held from **CLIENT**; or (c) pursue any other remedy in **KELLY STAFF LEASING's** power whatsoever.  **Guarantors** waive any defense arising by reason of any disability or other defense of **CLIENT** or by reason of the cessation from any cause whatsoever of the liability of **CLIENT**.  Until all indebtedness of **CLIENT** to **KELLY STAFF LEASING** shall have been paid in full, even though such indebtedness is in excess of **Guarantors'** liability hereunder, **Guarantors** shall have no right of subrogation, and waive any right to enforce any remedy which **KELLY STAFF LEASING** now has or may hereafter have against **CLIENT**, and waive any benefit of, and any right to participate in any security now or hereafter held by **KELLY STAFF LEASING**, and without limiting the generality of the foregoing, **Guarantors** specifically waive and relinquish as against **KELLY STAFF LEASING** any defense or benefit otherwise available to them should **KELLY STAFF LEASING** make an election of remedies as against **CLIENT** (and irrespective of the circumstances or manner in which or whereby such election is made) which destroys or impairs **Guarantors'** subrogation rights or rights to proceed against the **CLIENT** for reimbursement.  **Guarantors** waive all presentments, demands for performance, notice of non-performance, or other default, protests, notices of protest, notices of dishonor, and notices of acceptance of this guaranty and of the existence, creation, or incurring of new or additional indebtedness.  **Guarantors** assume the responsibility for being and keeping themselves informed of the financial condition of **CLIENT** and of all other circumstances bearing upon the risk of nonpayment of the indebtedness which diligent inquiry would reveal, and agree that **KELLY STAFF LEASING** shall have no duty to advise **Guarantors** of information known to it regarding such condition or such circumstances.

KSLREV 8/28/99                                              KELLY STAFF LEASING'S Initials  _W_A_C_

                                                                          CLIENT's Initials  _M_N_

KELLY STAFF LEASING, INC.                                                      EXHIBIT . G

Where any one or more of **CLIENTS** are corporations or partnerships, it is not necessary for **KELLY STAFF LEASING** to inquire into the powers of **CLIENT** or the officers, directors, partners or agents acting or purporting to act on their behalf, and any indebtedness .ade or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

**Guarantors** have entered into this guaranty with the understanding that **KELLY STAFF LEASING** may rely upon it to the exclusion of any other guarantees.  **KELLY STAFF LEASING** has not, nor has **CLIENT** represented that there are or may be other guarantors. However, nothing in this guaranty shall bind **KELLY STAFF LEASING** to seek other guarantors, separate and apart from the undersigned.  **Guarantors** understand that **KELLY STAFF LEASING** may already have, or concurrently herewith may have obtained or hereafter may obtain other guarantors (one or more, several or joint) of the indebtedness hereinabove referred to.  Such guarantors, heretofore, herewith, or hereafter obtained, shall in no way affect **Guarantors'** complete joint and several liability hereunder for the full amount of said indebtedness.  Nothing herein shall require **KELLY STAFF LEASING** to sue all of said **Guarantors** severally or together or to sue more than one or to pro rate the above liability among the **Guarantors** for the whole of said indebtedness; and within its sole and uncontrolled discretion **KELLY STAFF LEASING** may take judgment against any one of the **Guarantors** for the whole of the indebtedness above referred to, plus interest costs and attorney's fees, or within its sole and uncontrolled discretion **KELLY STAFF LEASING** may pro rate such judgment between or among one or more of such **Guarantors**.

**Guarantors** agree to pay reasonable attorney's fees and all other costs and expenses which may be incurred by **KELLY STAFF LEASING** in the enforcement of this guaranty, irrespective of whether suit is filed thereon.

**Guarantors** agree that recourse may be had against their separate property for all their obligations under this guaranty.

If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no may be affected, impaired or invalidated.

This Continuing Guaranty is executed by **Guarantors** this     2nd     Day of     March            ,  2000     .

| | |
|---|---|
| Marcia Namowitz | |
| **Name Printed** | **Name Printed** |
| | |
| **Signature** | **Signature** |

KSLREV 8/28/99                                          KELLY STAFF LEASING'S Initials

                                                        CLIENT's Initials

# Exhibit

# B


**KELLY**
SERVICES

## AGREEMENT TO PROVIDE PAYROLL SERVICES

**THIS AGREEMENT TO PROVIDE PAYROLL SERVICES** ("Agreement") is entered into this 20th day of March, 2000 between Marcia Namowitz("COMPANY") a NY/RAEFA, having its principal office at 333 EArle Ovington Blvd., Ste. 1010, Mitchel Field, NY 11553 and Kelly National Payroll Services, Inc., ("SUPPLIER") a Division of Kelly Services, Inc. with offices at 999 West Big Beaver Road, Troy, Michigan 48084, (collectively, the "Parties").

**WHEREAS**, COMPANY desires to have all payroll and personnel record keeping activities related to COMPANY's employees ("Supplied Personnel") handled on a Payroll Services basis; and

**WHEREAS**, SUPPLIER has the expertise and facilities to provide such Payroll Services and is willing to do so for COMPANY,

**NOW THEREFORE**, the Parties agree as follows:

1.  **DESCRIPTION OF SERVICES**.  SUPPLIER shall place on its payroll and perform a Payroll Services function or subcontract Services to another Division of Kelly Services, Inc. for Supplied Personnel subject to the following:

    a)  <u>Timely Payment of Wages.</u>  SUPPLIER shall timely pay the wages and related payroll taxes of the Supplied Personnel from SUPPLIER's own account.

    b)  <u>Workers' Compensation, Safety, and Health Compliance and Administration.</u>

        To the extent required by applicable law, SUPPLIER shall maintain and administer a proactive Workers' Compensation, safety, and health system as follows:

        i)  Maintain in effect Worker's Compensation coverage covering all Supplied Personnel.
        ii)  Complete and file all required Workers' Compensation forms and reports.
        iii)  Provide a Workers' Compensation claims coordinator to administer all Workers' Compensation claims covering the Supplied Personnel.
        iv)  Assist COMPANY in establishing a "modified return to work" program.
        v)  Maintain close contact with injured Supplied Personnel.
        vi)  Collect from COMPANY and pay the appropriate Workers' Compensation charges.  While the COMPANY maintains primary responsibility and ownership of the worksite, SUPPLIER retains a right over management of work-site safety, and the right to inspect the premises to insure that Supplied Personnel are working in a safe environment.
        vii)  Upon its receipt of a written request from COMPANY, SUPPLIER shall deliver to COMPANY a Certificate evidencing SUPPLIER's Workers' Compensation coverage on behalf of the Supplied Personnel.  SUPPLIER's duty to provide Workers' Compensation insurance to Supplied Personnel does not commence until the first payroll date of Supplied Personnel and ceases upon termination of the individual Supplied Personnel or of the contract, whichever occurs first.
        viii)  Absent an express written assumption of responsibility for state or federal OSHA compliance, SUPPLIER will be considered to have fulfilled its responsibility in a dual-employer relationship for state or federal OSHA purposes if SUPPLIER receives from COMPANY a written representation that: (a) COMPANY has established an effective safety program (Injury and Illness Prevention Program); (b) COMPANY will conduct and keep training current all required and specific training associated with Supplied Personnel's work related activities activities; (c) COMPANY will provide all required personal protective equipment (PPE) at the COMPANY's cost used by the Supplied Personnel.

KNPS 03/00                                    Page 1 of 9

SUPPLIER's Initials _____

COMPANY's Initials _____

    ix)  SUPPLIER may, at its option or by specific agreement provide resources to assist COMPANY with state or federal OSHA compliance responsibilities.  Such materials may include, but are not limited to: a sample Injury Prevention Program, general safety plans, regulations and/or contact information for safety consultants, or state and federal consultative services.  Such actions shall not be construed as an assumption of state and federal OSHA compliance responsibilities by SUPPLIER.

    x)  SUPPLIER's safety related suggestions to COMPANY to prevent or reduce occupational injury claims under SUPPLIER's Workers' Compensation insurance policy will not be considered to shift the responsibility for state and federal OSHA compliance from COMPANY to SUPPLIER absent SUPPLIER's express written assumption of that responsibility.

c)  <u>COMPANY shall be responsible for the following:</u>

    i)  COMPANY maintains primary responsibility and ownership of the worksite and shall ensure Supplied Personnel are working in a safe environment.

    ii)  COMPANY shall be solely responsible for compliance with all applicable federal, state and local laws and regulations relating to a safe and accessible work environment, including the provision of proper safety equipment, including, but not limited to federal and state Occupational Safety and Health Administration ("OSHA") laws and regulations, and the Americans with Disabilities Act (the "ADA") and its regulations.

    iii)  COMPANY will retain exclusive responsibility for state and federal OSHA compliance unless such compliance is expressly assumed in writing and agreed to by duly appointed SUPPLIER representatives.

    iv)  It is the sole responsibility of COMPANY to maintain state and federal occupational health and safety injury records (including but not limited to OSHA 200 Log).  SUPPLIER is responsible for providing all information to COMPANY necessary for COMPANY to complete state and federal OSHA compliance injury records.

    v)  COMPANY confirms to SUPPLIER that it has an illness and injury prevention policy which applies to all Supplied Personnel under its direction and control.

    vi)  COMPANY shall be responsible for all necessary job safety training including, but not limited to, worker orientation, specific job safety and the illness and injury prevention policy.

    vii)  COMPANY shall be responsible for providing all necessary personal protective equipment to Supplied Personnel at its cost.

    viii)  COMPANY shall notify SUPPLIER immediately in the event of an inspection of any of its facilities under the provisions of the Occupation Safety and Health Act.

d)  <u>Employee Benefits.</u>  SUPPLIER shall provide and explain to Supplied Personnel those employee benefits agreed upon by SUPPLIER and COMPANY.

e)  <u>Compliance with COBRA.</u>  During the term of this Agreement, SUPPLIER shall comply with all applicable provisions of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") as they pertain to the Supplied Personnel.

f)  <u>Maintenance and Retention of Payroll and Benefit Records.</u>  SUPPLIER shall maintain complete records of all wages, benefits and personnel actions paid or taken by SUPPLIER in connection with any of the Supplied Personnel, and shall retain control of such records at such SUPPLIER location as shall be determined solely by SUPPLIER, but shall make such records available as required by applicable federal, state or local laws.

g)  <u>Employee Handbook.</u>  SUPPLIER shall provide each of the Supplied Personnel with a generic Employee Handbook.

h)  <u>Monitoring and Recommending Changes to COMPANY in Employment Policies.</u>  SUPPLIER shall periodically review and recommend to COMPANY changes in employment policies affecting the Supplied Personnel resulting from changes in government regulations including, but not limited to, issues such as recruiting, interviewing, testing, selection, orientation, training, evaluating, replacing, supervising, disciplining and terminating employees.

SUPPLIER's Initials _____

COMPANY's Initials _____

1.  **COMPANY RESPONSIBILITIES.**  The activities to be performed by Supplied Personnel will be performed under the direction, supervision and control of COMPANY.   COMPANY will provide Supplied Personnel with (i) a suitable workplace which complies with all applicable safety and health standards, statutes and ordinances, (ii) adequate instructions, assistance, supervision and time to perform the Services.  COMPANY will be responsible for the acts, errors or omissions of the Supplied Personnel covered by this Agreement.  COMPANY will be solely responsible for the below:

    a)  That portion of the day-to-day supervision and control of the work to be performed by the Supplied Personnel, including attendance at work, as shall be necessary to achieve the objectives and results determined by COMPANY.  In addition, COMPANY shall establish and maintain the general procedures to be followed by the Supplied Personnel regarding the performance of their duties on behalf of COMPANY.

    b)  Unless SUPPLIER and COMPANY otherwise agree in writing, recruiting, interviewing, job training, work evaluation, supervision and discipline of each of the Supplied Personnel.

    c)  Any and all payments that COMPANY is responsible for as a result of COMPANY establishing any qualified or non-qualified retirement or deferred compensation plans.

    d)  Errors and omissions of the Supplied Personnel.

    e)  <u>Implementation of Internal Control Procedures.</u>  In the event that the Supplied Personnel are required, in the course of performing duties for COMPANY, to deal with confidential information, cash, high value items, or such other matters as COMPANY would treat as material elements of its business, the COMPANY will institute written internal control procedures related to such activities.

    f)  COMPANY is solely responsible for all liabilities of contractual agreements made between COMPANY and Supplied Personnel without the express written agreement of SUPPLIER.

    g)  <u>Appointment of SUPPLIER Liaison.</u>  SUPPLIER and COMPANY shall mutually agree to the appointment of one or more of the Supplied Personnel as liaisons between SUPPLIER and COMPANY.   Any individual appointed as a liaison shall cooperate with SUPPLIER in coordinating operational and administrative matters relating to services and benefits provided by SUPPLIER under this Agreement.

    h)  <u>Notification to SUPPLIER of Changes in Status of Any of the Supplied Personnel.</u>  COMPANY shall have a right to reject or have reassigned any of the Supplied Personnel, and a right to negotiate with SUPPLIER for any increase or decrease in the wages payable to any of the Supplied Personnel, provided that COMPANY complies with all applicable federal, state and local laws in taking any of these actions.

    i)  <u>Time Cards and Documentation of Services Performed by the Supplied Personnel.</u>  COMPANY agrees that it shall be solely responsible for the accuracy of records documenting the actual hours of services performed by each of the Supplied Personnel on behalf of COMPANY.  SUPPLIER shall have the right to verify the accuracy of said records and has a right to rely on the COMPANY's representation of the accuracy of said records.  COMPANY agrees that it shall report hours and earned pay information timely, at least three (3) days prior to payroll issue, for the preparation of payroll checks for the Supplied Personnel.  COMPANY also agrees to keep the original time records for a period of seven (7) years.

    j)  <u>Prohibition on Payment of Wages to the Supplied Personnel by COMPANY.</u>  COMPANY agrees that COMPANY shall not, directly or indirectly, pay any salary, wages, bonuses, or any other form of compensation, to the Supplied Personnel.  COMPANY further agrees that COMPANY shall not, directly or indirectly, provide any employee benefits to the Supplied Personnel, unless approved in writing by SUPPLIER.  The prohibitions contained in this Paragraph shall not apply to: (i) the inclusion of any of the Supplied Personnel in any one or more qualified retirements plans in which the COMPANY is a participating employer; or (ii) providing any of the Supplied Personnel with any benefits under a SEP-IRA program.

    k)  <u>Licenses and Permits for Operation of COMPANY's Business.</u>  COMPANY agrees to obtain and pay the costs of any required federal, state, county or municipal licenses or permits required in connection with the operation of its business or its utilization of the services of any of the Supplied Personnel. COMPANY agrees that SUPPLIER shall have no duties or responsibilities under this Agreement in connection with such licenses and permits.

SUPPLIER's Initials

COMPANY's Initials

l)  Reporting of On-the-Job Illness.  COMPANY shall report all on-the-job illnesses, accidents and injuries of the Supplied Personnel to SUPPLIER immediately (within 24 hours) upon notification of said injury by Supplied Personnel or Supplied Personnel's representative.  A written report of an accident or injury shall be delivered to SUPPLIER not later than three (3) days after the occurrence of the illness, accident or injury.  COMPANY's failure to timely report an injury may result in a substantial fine pursuant to applicable law.  Any fines or any other costs incurred by SUPPLIER as a consequence of COMPANY's failure to comply with the provisions of this Paragraph shall be the sole responsibility of COMPANY.

m)  Notification of Possible Layoffs and Business Closings.  In order to enable SUPPLIER to comply with any applicable provisions of the Worker Adjustment and Retraining Notification Act ("WARN Act"), COMPANY shall deliver to SUPPLIER ninety (90) days' prior written notice of any possible layoffs of the Supplied Personnel and of any closings of any business facility utilized by COMPANY.

3.  **JOINT OBLIGATIONS OF SUPPLIER AND COMPANY.**  SUPPLIER and COMPANY agree that they shall be jointly responsible for compliance with the provisions below.  In the event any monetary damages are payable by SUPPLIER or COMPANY to any third party as a result of SUPPLIER's or COMPANY's non-compliance with this Section, and in the event that SUPPLIER and COMPANY cannot agree on the allocation of responsibility for the payment of said loss, COMPANY and SUPPLIER agree to submit to arbitration, as defined in this Agreement, the allocation of responsibility for the payment of said loss.

a)  SUPPLIER and COMPANY shall each be responsible for compliance with Title VII of the Civil Rights Act of 1984, the Age Discrimination in Employment Act, and those additional federal, state, and local employment discrimination laws and regulations which are enacted subsequent to the date of this Agreement.  SUPPLIER shall be liable to the extent that COMPANY informs SUPPLIER of all potential and actual complaints, claims, etc. and cooperates with SUPPLIER investigations and resolutions thereof, and SUPPLIER acts or omissions following initial notification by COMPANY have not contributed to the claim asserted.

b)  Compliance with the Employment Retirement Income Security act of 1974 ("ERISA"), as amended, including the provisions of section 414(n) of the Internal Revenue Code, and the regulations issued under Section 414(n).

c)  Compliance with the provisions of Title I of the Americans with Disabilities Act ("ADA"), including the rules and regulations issued pursuant to the ADA.

d)  Compliance with Fair Labor Standards Act and the regulations issued pursuant to such Act, and any similar state or local law.

e)  Compliance with the Family and Medical Leave Act, and analogous state laws, including the rules and regulations issued pursuant thereto.

f)  Compliance with Older Workers Benefit Protection Act.

g)  Compliance with the Worker Adjustment and Retraining Notification Act, including the rules and regulations issues.

h)  Compliance with the Vietnam Era Readjustment Assistance Act.

4.  **PAYMENT.**  COMPANY shall compensate SUPPLIER for the performance of the Services covered by the Agreement according to the Fee Schedule (Exhibit A) which is attached.  COMPANY shall pay all invoices upon receipt.  In the event of a discrepancy in any invoice, the Parties will work in good faith to resolve the matter.

a)  COMPANY hereby agrees to pay SUPPLIER Fees as agreed upon by SUPPLIER and COMPANY for services performed by SUPPLIER as indicated in the attached Fee Schedule (Exhibit A).

b)  SUPPLIER can adjust Fees to include mandated tax increase, i.e. FICA, FUTA, SUI, Workers' Compensation, State Sales Tax, etc., when they become effective without prior notification to COMPANY.  SUPPLIER may also adjust employer benefit contribution amounts, listed on Exhibit A (COMPANY Fee Schedule) by providing the COMPANY with a written thirty (30) day notice.

SUPPLIER's Initials

COMPANY's Initials

c)   Notification of SUPPLIER of Errors in Amount of Fees.   COMPANY shall notify SUPPLIER, in writing, of any errors in the amount of the Fees set forth on any Fee statement delivered by SUPPLIER to COMPANY.   COMPANY's written notification of any errors must be received by SUPPLIER within thirty (30) days after COMPANY's receipt of the applicable statement from SUPPLIER.   If COMPANY fails to notify SUPPLIER of any errors in the applicable Fee statement within the thirty (30) day period, then COMPANY shall be deemed to have accepted the amount of Fees set forth on the applicable Fee statement as the correct amount, and COMPANY shall have no further right to seek reimbursement from SUPPLIER for any excess payments.

d)   Returned Checks - Additional Late Payment Fee.   If any of COMPANY's checks are returned unpaid by COMPANY's bank or other financial institution, or represent less than full payment, COMPANY shall pay SUPPLIER, on demand, an amount equal to three percent (3%) of the amount of the unpaid check.

e)   Delinquent Fees.   COMPANY acknowledges that its failure to pay Fees when due will result in additional expense to SUPPLIER.   Therefore, COMPANY agrees to pay, on demand, an amount equal to three percent (3%) of any delinquent payment.   In addition, COMPANY shall pay to SUPPLIER, on demand, an amount equal to one and one-half percent (1 ½%) per calendar month of the total amount of any delinquent payment until it is paid in full.   Delinquent Fees may be assigned to an outside party, which would include a collection agency or attorney, for collection.   If Fees are assigned, COMPANY agrees to be responsible for all collection charges, attorney fees and court costs incurred in order to collect these Delinquent Fees.

4.   **INSURANCE**.

a)   Maintenance of General Liability Insurance of COMPANY.   COMPANY agrees to maintain in full force and effect at all times during the term of this Agreement a Commercial General Liability and Professional Liability (if applicable) insurance policy or policies, with minimum coverage in the amount of five hundred thousand dollars ($500,000) combined single limit (CSL).   At a minimum, the Policies shall insure COMPANY against bodily injury and property damage liability on COMPANY's premises, business operations, completed operations and/or products or professional service, and non-owned automobile coverage.

b)   Automobile Liability Insurance to be Maintained by COMPANY.   If any of the Supplied Personnel drives any vehicle for any reason in connection with COMPANY's business operations, COMPANY shall maintain in effect one or more policies of automobile liability insurance which shall insure Supplied Personnel and COMPANY against public liability for bodily injury, death and property damage, with minimum coverage in the amount of five hundred thousand dollars ($500,000) combined single limit (CSL).

c)   SUPPLIER to be Issued a Certificate of Insurance.   COMPANY shall provide SUPPLIER with one or more Certificates of Insurance within thirty (30) days upon request by SUPPLIER, verifying COMPANY's compliance with the provisions of Paragraphs a and b of this Section.   COMPANY further agrees that each Certificate of Insurance delivered to SUPPLIER shall provide that thirty (30) days prior written notice of cancellation shall be delivered to SUPPLIER prior to the cancellation of, or any material change to, any of the Policies.

d)   SUPPLIER Not Required to Maintain General Liability or Automobile Insurance.   COMPANY agrees that SUPPLIER shall not provide any general liability insurance coverage for products liability, completed operations, or professional liability for any of the Supplied Personnel or for COMPANY.   COMPANY further agrees that SUPPLIER shall have no obligation to provide any form of automobile insurance coverage on behalf of any of the Supplied Personnel or for COMPANY.

SUPPLIER's Initials _____

COMPANY's Initials *MN*

e) <u>Waiver of Subrogation Rights.</u> SUPPLIER and COMPANY hereby waive any claims or rights of recovery against the other by way of subrogation or otherwise, which arise during the term of this Agreement, for any and all bodily injury, loss of, or damage to, any of their property, which loss or damage is covered by policies of insurance, to the extent that such loss or damage is recovered under such policies of insurance. SUPPLIER and COMPANY further agree to immediately give each insurance carrier which insures any of their property, written notice of the terms of the mutual waiver contained in this Paragraph (e). SUPPLIER and COMPANY further agree to properly endorse any of these policies, if necessary, to prevent the invalidation of the applicable insurance coverage as a consequence of the waiver contained in this Paragraph. Each of the parties agrees to cause its insurance carriers to provide the other party with written acknowledgement of such waiver upon request.

6. **INDEMNIFICATION BY SUPPLIER.** SUPPLIER will indemnify, defend and hold harmless COMPANY, its parents, subsidiaries, and affiliates and their respective directors, officers, employees and agents from and against all demands, claims, actions, losses, damages (including, but not limited to, property damage, bodily injury and wrongful death), judgments, costs and expenses (including reasonable attorney fees) (collectively "Damages") imposed upon or incurred by SUPPLIER, its parents, subsidiaries, and affiliates arising out of any of the following:

a) SUPPLIER's failure to comply with all applicable laws, regulations or orders;

b) Any negligent or intentional act or omission on the part of SUPPLIER, its officers, employees or agents, provided SUPPLIER's indemnity obligation will be limited to property damage, bodily injury and wrongful death;

c) Breach of any obligation of SUPPLIER contained in this Agreement; or

d) Any direct claim for Workers' Compensation benefits asserted against SUPPLIER by any of the Supplied Personnel assigned under this Agreement or, in the event of death, by their personal representatives.

Provided that, SUPPLIER's obligation to indemnify, defend and hold harmless will not apply (i) to indirect, special or consequential Damages, other than damages provided by statute, regulation, or order, (ii) to the extent Damages arise out of any negligent or intentional act or omission of SUPPLIER or its officers, employees or agents, or (iii) to the extent any damages arise out of any act, error or omission of a Supplied Personnel under this Agreement.

7. **INDEMNIFICATION BY COMPANY.** COMPANY will indemnify, defend and hold harmless SUPPLIER and its directors, officers, employees (including Supplied Personnel) on assignment under this Agreement) and agents from and against all Damages imposed upon or incurred by SUPPLIER arising out of any of the following:

a) COMPANY failure to comply with all applicable laws, regulations or orders;

b) Any negligent or intentional act or omission on the part of COMPANY, its officers, employees or agents, provided COMPANY indemnity obligation will be limited to property damage, bodily injury and wrongful death, excluding workers' compensation claims which are SUPPLIER's responsibility;

c) Breach of any obligation of COMPANY contained in this Agreement;

d) Acts or omissions of the Supplied Personnel with respect to the performance of assigned work;

e) Use of any vehicle, machinery, equipment or material in the care, custody or control of the Supplied Personnel in connection with the Services, except to the extent covered by SUPPLIER's Workers' Compensation insurance;

KNPS 03/00                    Page 6 of 9                    SUPPLIER's Initials

COMPANY's Initials

a) Handling of funds, securities or negotiable instruments by the Interns in connection with the Services; or

COMPANY obligation to indemnify, defend and hold harmless will not apply (i) to indirect, special or consequential damages, other than damages provided by statute, regulation, or order, or (ii) to the extent any damages relate to Sections 6 (a), (b) or (c) above and are caused by any negligent or intentional act or omission of SUPPLIER, its officers, employees (excluding the Supplied Personnel) or agents.

6. **NOTIFICATION OF CLAIMS**.  COMPANY and SUPPLIER agree (a) to notify each other in writing of any asserted claim within ten (10) days of eithers discovery of the occurrence upon which the claim may be based or learning of the claim, whichever occurs first, and (b) to permit SUPPLIER or COMPANY, as the case may be, to defend the claim at the option of the party against whom the claim is asserted with counsel acceptable to such party, which consent will not be unreasonably refused.  Neither party will pay or agree to pay any asserted claim under this Agreement without prior written approval from the party against whom the claim is asserted, which approval will not be unreasonably withheld; provided that approval on behalf of SUPPLIER must be obtained from the SUPPLIER Law Department in Troy, Michigan and approval on behalf of COMPANY must be obtained from COMPANY's Legal Representation.

7. **FORCE MAJEURE**.  SUPPLIER will not be responsible for failure or delay in assigning Supplied Personnel to COMPANY if the failure or delay is due to labor disputes and strikes, fire, riot, war, acts of God or any other causes beyond the control of SUPPLIER.  In the event SUPPLIER invokes this force majeure provision, COMPANY may find alternative source for the Payroll Services provided by SUPPLIER and reduce the scope of, or terminate SUPPLIER's services under this Agreement.

8. **CONFIDENTIALITY AND NON-USE.**  To effectively perform its services under this Agreement, SUPPLIER recognizes that it may receive or otherwise acquire information which COMPANY considers to be proprietary and confidential or which COMPANY is obligated to keep in confidence by agreement with a third party.  Therefore, SUPPLIER shall maintain any and all information transmitted to SUPPLIER by COMPANY or otherwise acquired by SUPPLIER as a result of performing its services under this Agreement, in confidence, without disclosing same to any third party without the prior written permission of COMPANY.  All business information and technical information received, developed or otherwise acquired during or because of the course of performing services under this Agreement is presumed to be confidential.  SUPPLIER further agrees to maintain in confidence all information concerning COMPANY and its operations which SUPPLIER, or its employees or representatives, obtain by observation or other means, as a result of their presence on the COMPANY's property.  SUPPLIER will use this information for the purpose of conducting its obligations as defined in this Agreement only and shall not use the information for any other purpose.

These obligations of confidence and non-use shall not apply to any information which is or becomes known to the public without fault of SUPPLIER, or which is acquired by SUPPLIER without obligation of confidence from a third party having the right to disclose the same.  The obligations specified in this Section shall survive the expiration date of this Agreement.

9. **LAWS, PERMITS AND LICENSES**.  SUPPLIER shall obtain all necessary permits, licenses and certifications necessary for the performance of the Services.  This Agreement shall be governed by all applicable state and federal laws.

10. **INDEPENDENT CONTRACTOR**.  In its performance of the Agreement, SUPPLIER will at all times act in its own capacity and right as an independent contractor, and nothing contained herein may be construed to make SUPPLIER an agent, partner or joint venture of COMPANY.  The Supplied Personnel assigned to COMPANY shall remain employees of SUPPLIER.

SUPPLIER's Initials

COMPANY's Initials

6. **TERM AND TERMINATION**.

    a) This Agreement shall become effective on the first day of the first pay period for Supplied Personnel and shall continue in effect thereafter until it is terminated in accordance with the remaining provisions of this Section 13. For the purposes of the Agreement, the date on which this Agreement is terminated shall be referred to as the "Termination Date."

    b) <u>Notice of Termination.</u> This Agreement may be terminated by either party, for any reason, by delivering written notice of termination to the other party, at least thirty (30) days prior to the Termination Date.

    c) <u>Termination of Agreement for Failure to Pay Fees.</u> If COMPANY fails to timely pay Fees, SUPPLIER shall have the right to immediately terminate this Agreement.

    d) <u>Immediate Termination Upon Material Breach of Agreement by COMPANY</u>. This Agreement shall immediately terminate upon the occurrence or discovery of a material breach by COMPANY of any provision of this Agreement. The following shall be deemed a material breach of this Agreement:

        i) COMPANY's failure to timely pay any Fees or other moneys required to be paid under this Agreement.
        ii) COMPANY's failure to maintain a safe and healthy work environment for the Supplied Personnel.
        iii) The filing by or against COMPANY of any petition for bankruptcy, receivership, insolvency or the making by COMPANY of an assignment for the benefit of creditors.
        iv) Failure by COMPANY to timely provide the signed and completed "Personal Employee Profile" on each of the Supplied Personnel.
        v) Failure by COMPANY to make truthful, accurate, and complete disclosure of all information requested by SUPPLIER prior to and during the term of this Agreement.

    e) <u>Effect of Termination of Agreement on the Supplied Personnel.</u> Upon the termination of this Agreement pursuant to the provisions of this Section 13, SUPPLIER reserves the right, but is not obligated, to extend continued employment to the Supplied Personnel covered by this Agreement.

    If this Agreement is terminated by any party, the provisions for health care continuation coverage shall be governed by Internal Revenue Code 4980B (COBRA). Both parties agree to cooperate to avoid the implication of a qualifying event under Internal Revenue Code 4980B. If COMPANY terminates this Agreement, or otherwise materially violates this Agreement, COMPANY alone shall be responsible for replacing health care coverage for the Supplied Personnel.

    If this Agreement is terminated by any party and COMPANY does not obtain similar replacement health care coverage for the employees, COMPANY shall immediately remit to SUPPLIER a fee of $500 per affected worker per month, without any corollary reduction in SUPPLIER's regular fee or moneys due to any Supplied Personnel covered by this expense in extending health care coverage continuation to the Supplied Personnel.

    If this Agreement is terminated by any party except if by COMPANY due to the breach or default of SUPPLIER and the affected employees are entitled to payment of any accrued vacation, sick or personal leave, COMPANY shall be liable for the payment thereof and will make such payment directly to SUPPLIER. If, however, COMPANY extends employment to the affected employee(s), then COMPANY shall be directly liable to the employee(s) for payment of accrued vacation, sick or personal leave.

15. **OTHER PROVISIONS**.

    a) **Merger and Modification**. This Agreement, together with its Exhibits, constitutes the complete and exclusive understanding between the Parties concerning the subject matter expressed herein. Any additional or different terms, whether written or oral, shall not be binding. This Agreement may only be modified by an amendment, expressly stated as such, signed by both Parties.

SUPPLIER's Initials

COMPANY's Initials *MN*

b) **Non-Assignability**.  The rights of this Agreement may not be assigned or delegated by SUPPLIER or COMPANY without prior written consent of the other Party.

c) **Non-Waiver**.  Failure of either party to exercise any of its rights under this Agreement on one occasion shall not waive its right to exercise the same on another occasion.

d) **Notices**.  Any notice or other communication required by this Agreement shall be in writing and shall be deemed given when sent by facsimile, U.S. Mail, or personal delivery as set forth below:

If to SUPPLIER:

> Kelly Services, Inc.
> 110 West A Street, Suite 1700
> San Diego, CA 92101
> Attention:  Jane Walleyn
> (619)-615-7987 (FAX)

If to COMPANY:
> Marcia Namowitz
> 333 EArle Ovington Blvd., Ste. 1010,
> Mitchel Field, NY 11553
>
> Attention: Marcia Namowitz at 516-228-0100

Either party may change its person, location or facsimile number to receive notices at any time upon 30 days' prior written notice.

e) **Severability**.  If any provision of this Agreement is held invalid, such invalidity shall not affect other provisions of this Agreement.  To the extent possible, the Parties agree to promptly negotiate in good faith to cure any invalid provision consistent with the intent and spirit of this Agreement.

f) **Survival of Certain Terms**.  The indemnification and confidentiality obligations of SUPPLIER described in Sections 5 and 9 shall survive the expiration or termination of this Agreement.

**SUPPLIER:**

By: _Lori S Sakorafis_   Date: _5-2-00_

Signature

_Lori Sakorafis_
Printed or Typed Name

_Dir.of Kelly Merch. Resources_
Title

**COMPANY:**

By: _Marcia Namowitz_   Date: _4/17/2000_

Signature

_Marcia Namowitz_

_Certified Financial Planner_
Title

SUPPLIER's Initials

COMPANY's Initials